**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

**12 Civ. 5724 (JGK)**

**IN RE NEW ORIENTAL EDUCATION &**
**TECHNOLOGY GROUP SECURITIES**
**LITIGATION**                                   **OPINON AND ORDER**

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

**JOHN G. KOELTL, District Judge:**


        This is an alleged securities fraud action brought on

behalf of a proposed class of investors in New Oriental

Education and Technology Group Incorporated ("New Oriental").

The lead plaintiff, Mineworker's Pension Scheme ("MPS"), brings

a consolidated putative class action suit on behalf of the

purchasers of American Depository Shares ("ADS") of New Oriental

who purchased ADS between October 19, 2009 and July 17, 2012

(the "Class Period").  The plaintiffs allege that New Oriental,

its CEO, Michael Yu, and its CFO, Louis Hsieh, (collectively,

"defendants"), violated Section 10(b) of the Securities Exchange

Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, promulgated

thereunder, 17 C.F.R. § 240.10b-5.  The asserted violations

include making material misrepresentations with respect to New

Oriental's consolidation of another company's financial

statements and with respect to New Oriental's commitment to

brand protection.  The plaintiffs also allege control person

liability against Hsieh and Yu (collectively, "individual

1

defendants") under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).  The defendants move to dismiss the Consolidated Amended Class Action Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Based on the alleged Securities Exchange Act violations, this court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  For the reasons explained below, the motion to dismiss is granted in part and denied in part.

I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  A complaint should not be dismissed if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Securities Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see also ATSI, 493 F.3d at 99.

When presented with a motion to dismiss under Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2000).  "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment."  Int'l Audiotext Network, Inc. v. AT & T Co., 62 F.3d 69, 72 (2d Cir. 1995); see also City of Roseville Emps' Ret. Sys. v. Energysolutions, Inc., 814 F. Supp. 2d 395, 401 (S.D.N.Y. 2011).

## II.

Unless otherwise indicated, the following facts are undisputed or accepted as true for purposes of this motion.

New Oriental is a Cayman Islands corporation with its principal place of business in the People's Republic of China ("PRC").  (Consolidated Amended Class Action Complaint ("CAC")

4

¶ 4.)  The company was incorporated in 2004, began trading ADS on the New York Stock Exchange in 2006, and has raised more than $100 million from U.S. capital markets.  (CAC ¶¶ 1, 9, 33.) It offers foreign language training, test preparation courses, online courses, and primary and secondary school education in China.  (CAC ¶ 5.)  It also develops and distributes educational content, software, and other technology.  (CAC ¶ 5.)

### A.

PRC law imposes restrictions on foreign companies operating in the education sector.  (CAC ¶ 6.)  "Foreign ownership of primary and middle schools for students in grades one to nine is forbidden, and foreign ownership of high schools for students in grades ten [to] twelve is restricted."  (CAC ¶ 27.)  Because New Oriental is partially owned by foreign investors, PRC law restricts the company's opportunities to offer education services.  As a result, New Oriental relies on a corporate structure called the Variable Interest Entity ("VIE") structure to offer its services in China.  (CAC ¶ 6.)

The VIE structure delegates to different entities those aspects of a business that foreign owned entities can and cannot administer.  (CAC ¶ 6.)  New Oriental provides those services that foreign owned entities can offer through its subsidiaries.

(CAC ¶ 6.)  The company provides those services that foreign
entities cannot offer by contracting with a Chinese-owned
corporation called New Oriental China ("NOC").  (CAC ¶ 96.)
Under the relevant contracts, New Oriental and its subsidiaries
(collectively, "New Oriental") are contractually obligated to
supply services to NOC and its subsidiaries (collectively,
"NOC").  (CAC ¶ 96.)  In exchange, New Oriental receives some
control over NOC's operations and some share of NOC's profits.
(CAC ¶ 96.)  The amount of NOC's profits to which New Oriental
is entitled varies, giving New Oriental a variable interest in
NOC, making NOC a VIE, and completing the VIE structure.  (CAC
¶ 6, 50.)


**B.**

United States Generally Accepted Accounting Principles
("GAAP") require that enterprises consolidate into their own
financial reporting the financials of certain VIEs.  (CAC ¶ 41.)
Financial Accounting Standards Board ("FASB") Interpretation
Number 46R ("FIN 46R") governed consolidation when New Oriental
was formed and applied until fiscal year 2011.[1]  (CAC ¶ 41.)  FIN

---

[1] The Financial Accounting Standards Board is a non-government
entity.  However, the Securities and Exchange Commission has,
pursuant to Section 19(b) of the Securities Act of 1933, 15
U.S.C. § 77s(b), and Section 13(b) of the Exchange Act of 1934,
15 U.S.C. § 78m(b), adopted as authoritative the Board's
accounting principles.  See Commission Statement of Policy

46R provided that enterprises were required to consolidate VIEs pursuant to a two-step test.  First, an enterprise had to determine that a VIE was subject to consolidation.  (Declaration of Scott D. Musoff ("Musoff Decl.") Ex. G ("FIN 46R") at ¶ 5.) Second, an enterprise had to determine that it was a VIE's primary beneficiary.  (FIN 46R at ¶ 14.)[2]  A VIE was subject to consolidation in several circumstances, including, for example, where individuals holding its equity lacked "the right to receive the expected residual returns of the entity."  (FIN 46R at ¶ 5(b)(3).)  An enterprise was a VIE's primary beneficiary when the enterprise could determine that it would "absorb the majority of the VIE's expected losses or receive a majority of the VIE's expected residual returns, or both."  (FIN 46R ¶ 14.) The FASB "decided not to specify a single technique for analysis of variable interest entities or otherwise limit an enterprise's ability to choose the technique it believes applies in its own specific circumstances."  (FIN 46R Appendix D ¶ D34.)

In its fiscal year 2009 and 2010 Annual Reports to the Securities and Exchange Commission ("SEC"), New Oriental

---

Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter, 68 Fed. Reg. 23,333-401 (May 1, 2003).
[2] FIN 46R also required that an enterprise identify its variable interests in an entity.  Variable interests in a VIE are "contractual, ownership, or other pecuniary interests . . . that change with changes in the fair value of the entity's net assets exclusive of variable interests."  (FIN 46R ¶ 2(c).)  It is undisputed that New Oriental had variable interests in NOC.

represented that its consolidation of NOC was proper under GAAP.[3]
(CAC ¶¶ 96, 98.)  The Annual Reports stated that NOC was subject
to consolidation for several reasons, among them, that the
equity owners of NOC lacked the right to receive its expected
residual returns and "substantially all" of NOC's business was
conducted for New Oriental.  (CAC ¶ 96.)  The reports also
stated that New Oriental was NOC's primary beneficiary "because
it holds all the variable interests in [NOC]."  (CAC ¶ 96.)

New Oriental's represented basis for concluding that NOC
was subject to consolidation and that New Oriental was NOC's
primary beneficiary included: service agreements that New
Oriental had with NOC, an equity pledge that New Oriental had
from NOC's shareholders, and an exclusive option that New
Oriental had to purchase NOC shares (collectively, "contractual
arrangements").  (CAC ¶ 96.)  New Oriental stated that the
service agreements entitled New Oriental to "significantly all
of [NOC's] net income," and that the equity pledge and exclusive
option to purchase NOC shares were "collateral to ensure [NOC's]
payments under the Service Agreements."  (CAC ¶ 96.)

The 2009 and 2010 Annual Reports stated that the service
agreements upon which New Oriental relied in consolidating NOC
fell into five categories: trademark licensing agreements,

---

[3] New Oriental began consolidating NOC in 2006.  (CAC ¶ 8.)

website development and use agreements, teaching support agreements, new enrollment system development agreements, and educational software agreements. (CAC ¶ 44.) The trademark agreements licensed New Oriental's trademark to NOC for fees predicated on quarterly revenues. (CAC ¶¶ 44, 45.) The website development and use agreements required New Oriental to provide website development and system maintenance to certain NOC schools and subsidiaries in exchange for an unspecified annual fee predicated on each NOC school's annual revenues and subject to quarterly adjustments. (CAC ¶ 44.) The teaching support agreements required New Oriental to provide teaching support services to certain NOC schools in exchange for an unspecified annual fee predicated on each school's annual revenues and subject to quarterly adjustments. (CAC ¶ 44.) The new enrollment system development service agreements required New Oriental to provide enrollment services to certain NOC schools in exchange for an unspecified fee predicated on the number of new enrollments in NOC schools each month and subject to quarterly adjustments. (CAC ¶ 44.) Finally, the educational software agreements required New Oriental to sell software to various NOC schools at mutually agreed-upon prices but without any written agreement. (CAC ¶ 44.)

The 2009 and 2010 annual reports did not disclose the precise fees to which New Oriental was entitled under the service agreements.  However, the plaintiffs allege that the revenue arrangements disclosed in New Oriental's 2012 Annual Report, which stated that New Oriental was entitled to between 2% and 6% of NOC's revenues under each of several service agreements and a $9.63 per student fee under the New Enrollment Development Agreement, were operative throughout the Class Period.  (CAC ¶¶ 45, 54-55.)  New Oriental maintains that, in the relevant fiscal years, it received a majority of NOC's profits.  New Oriental asserts that, pursuant to the service agreements, it received 56% ($59.4 million) of NOC's net income in fiscal year 2010 and 50.1% ($65.7 million) of NOC's net income in fiscal year 2011.

According to the 2009 and 2010 Annual Reports, the equity pledge agreement required that NOC shareholders pledge their rights and interests in NOC "to secure the performance of [NOC's] obligations under the relevant principal agreements," that is, under the service agreements.  (CAC ¶ 57; see also CAC ¶ 96.)  Under the equity pledge, NOC shareholders were prohibited from transferring or encumbering their interest in NOC without the prior written consent of an indirect subsidiary of New Oriental.  (See e.g., Musoff Decl. Ex. D ("2009 Ann.

10

Rep.") at 40, 64.)  The equity pledge agreement could only be exercised if NOC failed to perform under the relevant service agreements.  (CAC ¶ 58.)

The 2009 and 2010 Annual Reports also represented that the exclusive option agreement conferred on New Oriental the right to either purchase or demand that NOC shareholders transfer to a designated third party all of the NOC shareholders' interest in NOC.  (CAC ¶ 60.)  The option would vest "when and to the extent that applicable PRC law permits [New Oriental] to own part or all of such equity interests in [NOC]."  (CAC ¶ 60.)[4]

New Oriental's 2009 and 2010 Annual Reports included various certifications and disclosures concerning consolidation.

---

[4] There is a factual question as to whether the exclusive option agreement also permitted New Oriental to exercise its option "in other circumstances" that New Oriental deemed "proper or necessary."  (Musoff Decl. Ex. T ("New Oriental Registration Statement") at 56.)  This additional language appears in a form contract attached to New Oriental's 2006 Form F-1 Registration Statement filed with the SEC.  (New Oriental Registration Statement at 56.)  However, there is no indication that the form contract attached to the Form F-1 is in fact the May 13, 2006 exclusive option agreement to which New Oriental referred in its Class Period Annual Reports.  (See, e.g., Musoff Decl. Ex. F. ("2011 Ann. Rep.") at 64.)  The form agreement contains no dates, (New Oriental Registration Statement at 56), and in substance departs from the agreement as New Oriental represented it during the Class Period.  (Compare, New Oriental Registration Statement at 56, with 2011 Ann. Rep. at 64.)  The factual issues surrounding the additional language in the form exclusive option agreement cannot be resolved at this stage in the litigation. (See, e.g., 2011 Ann. Rep. at 64.)  Accordingly, for purposes of this motion, the exclusive option agreement is presumed operative only when and to the extent permissible under PRC law.

The company's independent auditor, Deloitte, Touche, Tohmatsu, certified the company's consolidated balance sheets using GAAP standards and found that New Oriental's financial statements fairly represented the company's financial position.  (See e.g., 2009 Ann. Rep. at F-2.)  Under the heading "Risks Related to Our Corporate Structure," New Oriental disclosed its dependence on NOC, its concern that NOC could breach the contractual agreements, and its vulnerability to potential regulatory action.  (2009 Ann. Rep. at 12.)  New Oriental further disclosed that it shared many executives and directors with NOC and could not guarantee that conflicted executives and directors would act in New Oriental's best interest.  (2009 Ann. Rep. at 13.)

## C.

In 2009, the FASB issued Statement of Financial Accounting Standards No. 167.  (CAC ¶¶ 62-63.)  SFAS 167 amends the standard for evaluating whether an enterprise is a VIE's primary beneficiary and thus modifies the circumstances in which consolidation is required.  (Musoff Decl. Ex. H (Statement of Financial Accounting Standards Number 167, ("SFAS 167")) at i-ii.)  Under the revised standard, an enterprise is a VIE's primary beneficiary if the enterprise has "[t]he power to direct the activities of [a VIE] that most significantly impact the

[VIE's] economic performance," and has either "[t]he obligation to absorb losses of the [VIE] that could potentially be significant to the [VIE] or the right to receive benefits from the [VIE] that could potentially be significant to the [VIE]." (SFAS 167 at i-ii.) "An enterprise must identify which activities most significantly impact the VIE's economic performance and determine whether it has the power to direct those activities. . . . An enterprise does not have to exercise its power in order to have power to direct the activities of [a VIE.]" (SFAS 167 at 7-8.) SFAS 167 also expressly departs from the more quantitative approach to evaluating primary beneficiary status under FIN 46R. (SFAS 167 at ii.)

New Oriental began consolidating NOC and its subsidiaries under SFAS 167 in fiscal year 2011 and represented in its 2011 Annual Report that it had done so properly. (CAC ¶ 99.) New Oriental stated that consolidation was appropriate because NOC remained subject to consolidation and New Oriental satisfied the SFAS 167 primary beneficiary standard. (See CAC ¶ 99.) New Oriental represented that it was NOC's primary beneficiary because New Oriental had "the power to direct the activities of the VIE that most significantly affect the entity's economic performance," and had "the right to receive benefits from the VIE." (CAC ¶ 99.) As in fiscal years 2009 and 2010, New

13

Oriental represented that consolidation was predicated on its service agreements, equity pledge, and exclusive option agreement.  (CAC ¶¶ 96, 99.)

In its 2011 Annual Report, New Oriental represented as operative at least three categories of service agreements with NOC, including the trademark licensing agreement, new enrollment system development service agreement, and sale of educational software agreement.  (CAC ¶ 64.)  The representations made were substantially unchanged from those operative in fiscal years 2009 and 2010.  (CAC ¶¶ 44, 64.)  New Oriental asserts that, pursuant to these service agreements, it received 75% ($118.6 million) of NOC's net income in the 2012 fiscal year.  However, the plaintiffs allege that only one service agreement remained effective after January of 2011.  (SAC ¶ 71.)

New Oriental also represented that its equity pledge and exclusive option agreement remained operative in 2011.  (CAC ¶ 70.)  However, the plaintiffs allege that, by 2011, New Oriental's equity pledge secured NOC's performance of only the one remaining service agreement.  (CAC ¶¶ 73-74.)

As in previous years, New Oriental's 2011 Annual Report contained a certification from Deloitte, Touche, Tohmatsu that New Oriental had fairly represented its financial position in its consolidated financial statements.  New Oriental also

14

disclosed again its dependence on NOC, concern that NOC might breach the contractual agreements, vulnerability to adverse regulatory action, and reliance on conflicted executives and directors.  (2011 Ann. Rep. at 13-15.)

**D.**

During the Class Period, New Oriental represented that its brand was critical to its growth.  (CAC ¶¶ 77-78.)  In its Class Period Annual Reports New Oriental stated that it had spent a decade building its trade name "by emphasizing quality and consistency and building trust among students and parents." (CAC ¶ 77.)  The Annual Reports explained that New Oriental's business was dependent on its brand and stated that if New Oriental was "not able to maintain and enhance [its] brand, [its] business and operating results" could be harmed.  (CAC ¶ 77.)  New Oriental also assured investors that NOC owned all of its schools and learning centers.  (CAC ¶¶ 122-124.)  By the end of fiscal year 2012, NOC operated 55 such schools and 609 such learning centers, serving 2.4 million students.  (Musoff Decl. Ex. C. ("2012 Ann. Rep.") at 29.)

15

**E.**

On July 17, 2012, New Oriental released unaudited financial results from the fiscal year ending May 31, 2012 and disclosed that the SEC had issued a formal order of investigation into New Oriental. (CAC ¶ 82.) New Oriental stated its belief that the SEC investigation concerned the company's consolidation of NOC. (CAC ¶ 82.) That day, New Oriental shares declined by $7.64 per share, closing down 34.32%. (CAC ¶ 83.)

The following day, July 18, 2012, Muddy Waters, LLC, published a report recommending that investors sell shares of New Oriental. (CAC ¶ 84.) Muddy Waters is a firm that investigates and short-sells various companies. (Musoff Decl. Ex. B ("Muddy Waters Report") at 1.) In its report, Muddy Waters alleged that New Oriental lacked a basis to consolidate NOC for several reasons. First, New Oriental did not own NOC's critical assets, had not secured a proxy agreement from NOC's shareholders, and was not granted power of attorney by NOC. (CAC ¶ 85; Muddy Waters Report at 28-29) Second, New Oriental's control over critical software codes and web domains, NOC directors and executives, and NOC business decisions was weak or completely lacking. (CAC ¶ 69.) Third, New Oriental deliberately implemented a weak VIE structure. (CAC ¶ 86.)

16

The Muddy Waters report made additional allegations.  It
stated that New Oriental's auditing costs raised suspicion
because New Oriental incurred smaller auditing fees than peer
companies and because New Oriental had reduced auditing fees by
more than 30% from 2007 to 2011, a period during which the
company grew.  (CAC ¶ 87; Muddy Waters Report at 21.)  The
report further stated that New Oriental had initiated a "brand
name cooperation program" in January 2010. (CAC ¶ 80.)  The
brand name cooperation program allegedly functioned like a
franchising agreement, allowing third parties to offer New
Oriental's "Pop Kids" English program and "New Oriental Star"
kindergarten programs.  (CAC ¶ 80.)  According to Muddy Waters,
New Oriental exercised less control over the third party
offerings than its own.  (CAC ¶ 84.)

The Muddy Waters report predicted that New Oriental would
be required to restate its earnings and that Deloitte, Touche,
Tohmatsu would resign as New Oriental's independent auditor.
(Muddy Waters Report at 1.)  On July 18, 2012, after the Muddy
Waters Report was released, New Oriental shares declined by
$5.12 per share to close down more than 35%. (CAC ¶ 15.)

In light of the Muddy Waters report, New Oriental convened
a special committee of three directors to investigate the
allegations against it.  (2012 Ann. Rep. at 78.)  The committee

investigated whether the brand cooperation program was in fact a franchising program and whether consolidation of NOC and its subsidiaries was improper under GAAP.  (2012 Ann. Rep. at 79.) It concluded that NOC owned all of its schools and learning centers.  (See 2012 Ann. Rep. at 79.)  The committee further found that the brand cooperation program did not involve franchising, was properly accounted for in New Oriental's financial statements, and was immaterial to investors.  (2012 Ann. Rep. at 79.)  The committee terminated its inquiry into New Oriental's consolidation of NOC when, on the basis of representations New Oriental made to the SEC, the SEC's Corporate Finance Division informed New Oriental that it did not object to New Oriental's consolidation of NOC.  (2012 Ann. Rep. at 79; CAC ¶ 89.)  However, the SEC's Enforcement Division continues to investigate New Oriental's consolidation of NOC. (CAC ¶ 90.)

To date, New Oriental has not restated its earnings, nor has Deloitte, Touche, Tohmatsu resigned as New Oriental's independent auditor.  (2012 Ann. Rep. at 2.)  Deloitte, Touche, Tohmatsu certified New Oriental's consolidated financial statements for the 2012 fiscal year.

**F.**

The plaintiffs allege that statements made in New Oriental's annual reports and by the individual defendants contained actionable misrepresentations or omissions regarding New Oriental's consolidation of NOC and its commitment to brand protection.  With respect to consolidation, the plaintiffs allege that the defendants materially misled investors in two ways.  First, the plaintiffs allege that New Oriental falsely represented its basis for consolidating NOC because its contractual arrangements with NOC were insufficient to satisfy the relevant GAAP standards.  (CAC ¶¶ 93, 96, 97.)  Second, the plaintiffs allege that the defendants inflated New Oriental's assets and revenues by inappropriately consolidating NOC's assets and revenues.  (CAC ¶¶ 102-03, 107, 109-14, 116-19.)  With respect to brand protection, the plaintiffs allege that the failure to disclose the brand cooperation program was materially misleading because the program transferred control over New Oriental's brand to third parties and thus threatened to cause New Oriental reputational harm.  (CAC ¶ 79.)

The plaintiffs sue New Oriental and individual defendants Yu and Hsieh for the alleged misstatements. (CAC ¶¶ 22, 24-25.) Both individual defendants signed New Oriental's Annual Reports and the Sarbanes-Oxley certifications therein.  (CAC ¶ 95, 98-

19

99.)  The Consolidated Amended Class Action Complaint states
that the individual defendants, as directors and senior
executives, were presented with the statements on consolidation
and ownership of schools that are at issue in this action and
that were made in SEC reports, press releases, and presentations
to analysts and institutional investors.  (CAC ¶¶ 127-28.)  The
individual defendants were thus allegedly positioned to prevent
or correct New Oriental's false or misleading statements or
omissions.  (CAC ¶ 128.)


III.

The Consolidated Amended Class Action Complaint states two
causes of action.  First, the plaintiffs claim that defendants
New Oriental, Yu, and Hsieh made material misstatements and
omissions in violation of Section 10(b) of the Exchange Act and
Rule 10b-5. Second, the plaintiffs claim that Yu and Hsieh
violated Section 20 of the Exchange Act as control persons of
New Oriental.

The defendants move to dismiss the claims.  With respect to
the Section 10(b) claim, the defendants argue that the
plaintiffs have failed to allege material misstatements or
omissions, scienter, and loss causation.  With respect to the
Section 20(a) claim, the defendants argue that dismissal is

20

required because the plaintiffs have failed to plead primary violations of the Exchange Act.

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.  <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 161 (2d Cir. 2000); <u>see also</u> <u>City of Roseville</u>, 814 F. Supp. 2d at 409.

The Complaint alleges both false statements of material fact and true statements that are rendered misleading by material omissions.  An alleged omission of fact is material if there is "a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted).  "Put another way, a

fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 92-93 (2d Cir. 2010) (internal quotation marks and brackets omitted).

"[A]n omission is actionable under [federal] securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Even though Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a "duty to be both accurate and complete." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002). "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008). However, corporations are "not required to disclose a fact merely because a reasonable investor would very much like to know that fact." In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d at 267); see also City of Roseville, 814 F. Supp. 2d at 410.

**A.**

The plaintiffs argue that New Oriental materially misrepresented its basis for consolidating NOC under GAAP.  The defendants reply that the plaintiffs have failed to plead with particularity facts sufficient to support their allegations.

In fiscal years 2009 and 2010, FIN 46R governed consolidation under GAAP.  Under FIN 46R, an enterprise must consolidate certain VIEs pursuant to a two-step test.  First, the consolidating enterprise must determine that the VIE is subject to consolidation.  (FIN 46R ¶ 5.)  If a VIE is subject to consolidation under FIN 46R, the consolidating enterprise must next determine that it is the VIE's primary beneficiary. (FIN 46R ¶ 14.)

In this case, the plaintiffs allege that the defendants misrepresented their basis for consolidating NOC at the second stage of this analysis.  In other words, the plaintiffs argue that New Oriental was not NOC's primary beneficiary.  Under FIN 46R, an enterprise qualifies as a primary beneficiary if it will absorb the majority of the VIE's expected losses, receive a majority of the VIE's expected residual returns, or both.  (FIN 46R ¶ 14.)  New Oriental relies only on the contention that it correctly represented that it would receive a majority of NOC's expected residual returns.  The plaintiffs contend that New

23

Oriental misrepresented its basis for satisfying this standard and thus misled investors.

Throughout the Class Period, New Oriental represented that its contractual arrangements with NOC required that NOC perform "substantially all" of its business for New Oriental.  (CAC ¶ 96.)  New Oriental stated that its service agreements entitled it to "significantly all of [NOC's] net income" and that the equity pledge and exclusive option agreement provided "collateral to ensure [NOC's] payments under the Service Agreements."  (CAC ¶ 96.)  New Oriental also stated that it was NOC's primary beneficiary "because it holds all the variable interests in [NOC]."  (CAC ¶ 96.)

The only agreements that supplied New Oriental with any right to receive NOC's residual returns were its service agreements.  However, the defendants did not make public the amount of NOC revenue to which New Oriental was entitled under the service agreements that were operative in 2009, 2010, and 2011.  In 2012, the defendants disclosed for the first time the percentages of NOC revenues and the fees to which New Oriental was entitled under the agreements effective in that year.  The Consolidated Amended Class Action Complaint alleges that these amounts were insufficient to grant New Oriental a right to the majority of NOC's residual returns because they only entitled

New Oriental to between 2% and 6% of various NOC entities'
revenues, or to other limited fees.  (CAC ¶ 54.)  The plaintiffs
also allege that the fee structures operative in 2012 were
operative throughout the Class Period.  The allegations thus
support a plausible inference that the payments to which New
Oriental was entitled amounted to significantly less than a
majority of NOC's residual returns.  Accordingly, the plaintiffs
have sufficiently alleged that New Oriental did not have a right
to receive the majority of NOC's residual returns in fiscal
years 2009 and 2010.

    The defendants contend that the plaintiffs' allegations are
insufficient for three reasons.  The defendants first argue that
they did not materially misrepresent New Oriental's basis for
consolidation because New Oriental received in the relevant
fiscal years a majority of NOC's residual returns under the
service agreements.  This response misses the point.  That New
Oriental happened to receive a majority of NOC's residual
returns does not establish that New Oriental had the right to
receive that amount of NOC's residual returns or that the
contractual arrangements provided New Oriental with the
substantial ability to control NOC.  Because the plaintiffs made
allegations about the 2009 and 2010 service agreements, the
Court invited the defendants to produce those agreements in

order to refute the plaintiffs' allegations with the actual

agreements.  The defendants chose not to do so.  The plaintiffs

have plausibly alleged that the 2009 and 2010 service agreements

did not provide New Oriental with a contractual right to receive

a majority of NOC's residual returns under the service

agreements in a given year.

The defendants next argue that many of the percentages

could be adjusted unilaterally by New Oriental.  But the record

on this motion contains no evidence that New Oriental actually

possessed the unilateral right to adjust fees so that it would

receive a majority of NOC's residual returns.  New Oriental

points to language in two 2012 agreements, the Development

Services Agreement and Technology Services Agreement, suggesting

that it was permitted at will to adjust the percentage of

revenues that NOC owed under the service agreements.  (Musoff

Decl. Ex. Q at 7, 15.)  However, New Oriental did not identify

any such language in the 2009, 2010, or 2011 agreements, which

New Oriental chose not to make part of the record on this

motion.

The defendants also argue that they did not misrepresent

their basis for consolidating under FIN 46R because the FASB did

not specify a single approach to analyzing variable interests

under the provision.  The FASB's flexibility in this regard is

26

not dispositive.  That enterprises can tailor their approach to assessing primary beneficiary status under the FASB guidance does not absolve an enterprise of its obligation to represent accurately the approach it ultimately adopts.  The plaintiffs plausibly allege that New Oriental did not discharge that obligation because they represented that the service agreements gave New Oriental the right to receive a majority of NOC's residual returns when in fact the agreements did not.

The plaintiffs have plausibly alleged that New Oriental's stated basis for consolidation in fiscal years 2009 and 2010 was misleading.  It was materially so because consolidation supplied 65% and 67% of New Oriental's total assets in fiscal years 2009 and 2010, respectively, and because consolidation supplied substantially all of New Oriental's revenues.  (See CAC ¶¶ 102, 103.)  The plaintiffs have sufficiently alleged material misstatements.  See, e.g., Ganino, 228 F.3d at 166 (refusing to dismiss as immaterial misstatements amounting to 11.7% and 8% of pre-tax income).

The plaintiffs allege that New Oriental's 2011 Annual Report contained representations about consolidation that were substantially identical to those made in the 2009 and 2010 Annual Reports.  (CAC ¶ 99.)  Additionally, the 2011 Annual Report stated that New Oriental's contractual arrangements with

NOC gave New Oriental the "substantial ability to control NOC," and enabled New Oriental to "exercise effective control over [NOC]" and "receive a substantial portion of the economic benefits from [NOC]." (2011 Ann. Rep. at 44, 71.)

The 2011 Annual Report acknowledged that SFAS 167 had amended the primary beneficiary standard to require a more qualitative inquiry. (CAC ¶ 99.) The Annual Report explained that, under SFAS 167, consolidation was required if an enterprise had both "the power to direct the activities of a VIE that most significantly affect the [VIE's] economic performance" and either "the obligation to absorb losses of or the right to receive benefits from the entity." (CAC ¶ 99.) New Oriental represented that its contractual arrangements with NOC satisfied this new standard. (See CAC ¶ 99.)

The plaintiffs argue that New Oriental's stated basis for consolidation, its contractual arrangements with NOC, did not afford it the requisite control under SFAS 167. The defendants allege that New Oriental's contractual arrangements with NOC gave New Oriental "[t]he power to direct the activities of a [VIE] that most significantly affect the [VIE's] economic performance." (SFAS 167 at i.) However, the plaintiffs plausibly allege that this is simply not so. The Consolidated Amended Class Action Complaint alleges that, in exchange for

28

providing services to NOC, New Oriental was entitled to between 2% and 6% of NOC's revenues during fiscal year 2011.  Because these amounts are very low, they do not support New Oriental's public representations that these contractual arrangements gave New Oriental the power to direct the activities that most significantly affected NOC's performance in fiscal year 2011.

New Oriental's other contractual arrangements with NOC also fail to undermine the plaintiffs' allegations that New Oriental lacked the ability to direct the activities that most significantly affected NOC's performance in fiscal year 2011, as required under SFAS 167.  For example, the Consolidated Amended Class Action Complaint alleges that New Oriental's exclusive option agreement with NOC shareholders was operative only "when and to the extent that applicable PRC law permits [New Oriental] to own part or all of such equity interests in [NOC]."  (CAC ¶ 60.)  According to the plaintiffs, PRC law did not at any point during the Class Period allow New Oriental, a foreign owned enterprise, to own NOC, an enterprise providing services in the education sector.  (CAC ¶ 75.)  The plaintiffs have thus pleaded with particularity facts supporting the claim that the exclusive option agreement was without effect.  The plaintiffs also plead with particularity that New Oriental's equity pledge

was unenforceable under PRC law because it was not registered with the proper authorities.  (CAC ¶ 59.)

Taken together, the plaintiffs' allegations regarding the service agreements, equity pledge, and exclusive option agreement support a plausible inference that the defendants' contractual arrangements with NOC did not afford New Oriental sufficient meaningful control over NOC.  Accordingly, the plaintiffs have sufficiently alleged that New Oriental's represented basis for satisfying the control provision of SFAS 167, and thus the entire provision, could mislead a reasonable investor.  The plaintiffs have plausibly alleged that, like misrepresentations made in fiscal years 2009 and 2010, the alleged misrepresentations made in 2011 were material because they misled investors as to the basis for incorporating into New Oriental's financials an overwhelming percentage of New Oriental's total assets (62%) and revenues (97.2%).  (CAC ¶ 107.)


**B.**

The plaintiffs also argue that, because New Oriental's represented basis for consolidating NOC was inaccurate, New Oriental improperly consolidated NOC under GAAP.  The plaintiffs thus allege that New Oriental's Class Period financial

statements misstated its assets and revenues to the extent that those statements incorporated NOC assets, which represented between 62% and 67% of New Oriental's reported assets during the Class Period, and NOC revenues, which represented substantially all of New Oriental's reported revenues during the Class Period.

The Second Circuit Court of Appeals has held that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996). However, allegations of GAAP violations are actionable when "coupled with evidence of corresponding fraudulent intent." Novaks, 216 F.3d at 309.  Accordingly, the plaintiffs can plausibly allege a Section 10(b) claim predicated on the defendants' failure to comply with FIN 46R and SFAS 167 by pleading material violations of either provision, in addition to pleading scienter.

The plaintiffs have plausibly alleged that New Oriental's contractual arrangements with NOC did not adequately support consolidation and that the specific factual representations about those contractual agreements were false and misleading. The defendants have not identified any additional agreements that provided New Oriental with either the right to receive a

31

majority of NOC revenues under FIN 46R or the ability to control the economic activities most significant to NOC's success under SFAS 167.  Therefore, the plaintiffs have sufficiently alleged that New Oriental's Class Period financial statements materially misled investors to the extent that they consolidated NOC assets and revenues.

### C.

Finally, the plaintiffs allege that the defendants' failure to disclose New Oriental's brand cooperation program rendered materially misleading certain statements made by the defendants regarding the importance of New Oriental's brand.  The brand cooperation program allowed third parties in small cities to offer two of New Oriental's programs, its "Pop Kids" English program and its "New Oriental Star" kindergarten program. During the Class Period, New Oriental allowed twenty-one third parties to participate in the brand cooperation program. However, since the end of the Class Period, New Oriental has reiterated that it owns all of its schools and learning centers and does not own the facilities in which its brand cooperation partners offer programs.  (Musoff Decl. Ex. J at 5.)  Although the plaintiffs dispute that characterization, they have not presented any plausible factual allegations to the contrary.

32

New Oriental excludes from its facilities count all facilities operated by brand cooperation partners and excludes from its enrollment count all students who participate in brand cooperation programs.  (Musoff Decl. Ex. J at 5.)  It is undisputed that the brand cooperation program accounted for only 0.009% of New Oriental's fiscal year 2010 revenues and 0.045% of its fiscal year 2011 revenues.  (Musoff Decl. Ex. J at 5.)[5]  The plaintiffs concede that revenues derived from the brand cooperation program are not quantitatively material.

The plaintiffs contend that the existence of the brand cooperation program rendered false and misleading the statements New Oriental made about the importance of its brand.  Before the Class Period, on a conference call with analysts, Hsieh represented that New Oriental had never franchised "in the big cities."  (CAC ¶ 79.)  Hsieh also stated that franchising was not an "optimal model" for growth, and articulated risks associated with franchising, including the loss of control over school appearance and teaching quality.  (CAC ¶ 79.)  During the Class Period, New Oriental's annual reports represented that New Oriental, through NOC, owned all of its schools and learning

[5] These figures, and other specifics about the brand cooperation program, were disclosed in a July 19, 2012 press release.  The plaintiffs acknowledge that the Court may rely on the July 19 press release for purposes of this motion to dismiss.  (Transcript of September 10, 2013 Oral Argument at 41.)

centers.  New Oriental also represented that it had spent a
decade building its trade name "by emphasizing quality and
consistency and building trust among students and parents."
(CAC ¶ 77.)  Class Period Annual Reports declared that New
Oriental's business was dependent on its brand and stated that
if New Oriental was "not able to maintain and enhance [its]
brand, [its] business and operating results" could be harmed.
(CAC ¶ 77.)

The Second Circuit Court of Appeals has explained that
courts must fully analyze "all relevant considerations" when
assessing materiality.  Litwin v. Blackstone Group, L.P., 634
F.3d 706, 717 (2d Cir. 2011); Hutchinson v. Deutsche Bank Sec.
Inc., 647 F.3d 479, 485 (2d Cir. 2011).  Where misstatements
implicate less than 5% of an entity's revenue, the misstatements
are not likely to be material.  Litwin, 634 F.3d at 717.  In
this case, the plaintiffs are complaining about the failure to
disclose a minor program that did not impact the schools that
NOC ran.  The program that New Oriental did not trumpet
implicated only 0.009% and 0.045% of New Oriental's revenues in
2010 and 2011 and was thus quantitatively immaterial.

Under the holistic analysis endorsed by the Court of
Appeals, sufficiently strong qualitative evidence of materiality
can establish materiality as a matter of law.  Id. at 717-18.

The qualitative inquiry is guided by SEC Staff Accounting
Bulletin No. 99 ("SAB 99"), 64 Fed. Reg. 45,150 (1999).  Id. at
717.  SAB 99 provides a non-exhaustive list of the relevant
qualitative factors, including whether omissions relate to a
significant aspect of operation and whether there was a
significant market reaction to disclosure of the omissions.  Id.
at 714; see also SAB 99, 64 Fed. Reg. at 45,152.

Omissions relating to a significant aspect of operations
pertain to "a particular product or product[ ]line, or division
or segment of a company's business" that has "independent
significance for investors."  Hutchinson, 647 F.3d at 488.
"[S]uch a product or segment might be the company's original
niche, its iconic or eponymous business, critical to its
reputation, or most promising for growth or as an engine of
revenue."  Id.  The Court of Appeals has found losses totaling
just 0.4% of assets under a defendant's management material
where losses occurred in a division of the defendant's
operations that the defendant had touted as its "flagship
segment," and the losses amounted to 69% of a yearly decline in
revenues for that segment.  Litwin, 634 F.3d at 711, 713, 720.
In such circumstances, reasonable investors would "almost
certainly" have wanted to know about the losses.  Id. at 720.

The brand cooperation program is altogether unlike a "flagship segment" for several reasons. First, the plaintiffs do not claim that the offered programs figure prominently in New Oriental's success; second, there is no indication that third parties are permitted to open New Oriental branded schools or learning centers, rather than independently owned facilities; and, third, the brand cooperation program was only extended to twenty-one small cities during the Class Period. Moreover, the plaintiffs have not alleged with particularity any facts suggesting that the brand cooperation program has affected New Oriental's brand. Accordingly, the plaintiffs have not plausibly alleged that the brand cooperation program was a qualitatively significant aspect of operations, and their claim that the program was material to reasonable investors is without merit. Hutchinson, 647 F.3d at 488, 490 (finding losses on loans constituting 25% of company's mezzanine loan portfolio immaterial because plaintiffs pleaded no facts establishing that portfolio was of distinct interest to investors).

The plaintiffs make two additional arguments as to why disclosure of the brand cooperation program was a qualitatively significant aspect of operations. Neither is persuasive. First, the plaintiffs allege that a NOC employee asserted that NOC exercised less control over third-party offerings than its

36

own.  (CAC ¶ 80.)  However, the alleged lack of control over
brand cooperation partners does not suggest that such an
insignificant program could harm New Oriental, such that
reasonable investors would have wanted to know about the
program.  See Litwin, 634 F.3d at 717.

Second, the Consolidated Amended Class Action Complaint
appears to suggest that the brand cooperation program could
damage New Oriental's brand because of its size.  However, the
plaintiffs make no particularized allegation that the third
party offerings can be equated with NOC schools or learning
centers.  The brand cooperation partners operated only in small
cities, and generated revenues that were plainly miniscule.  The
plaintiffs have therefore failed to allege that these "franchise
schools" are significant compared to NOC schools in revenue,
impact, or size, and have not stated a plausible claim that
these offerings would be significant to a reasonable investor.[6]

---

[6] Revenues from the brand cooperation program increased seven-
fold from fiscal year 2010 to fiscal year 2011, (Musoff Decl.
Ex. J at 5), but that is only because the 2010 revenues were a
miniscule $35,000.  Brand cooperation partners were penalized
approximately $16,000 for failing to open new locations each
year.  While the plaintiffs view this expansion as significant,
no reasonable investor would have considered the expanding scope
of the brand cooperation program consequential during the Class
Period, given that the program generated, at most, only .045% of
New Oriental's yearly revenue, and penalties of $16,000 are de
minimis.

The plaintiffs have also failed to allege a significant market reaction that could support qualitative materiality.  The Consolidated Amended Class Action Complaint states that New Oriental's stock declined $5.12 to close down 34.3% after the Muddy Waters Report revealed the brand cooperation program.  But market reaction, taken alone, is often "too blunt an instrument to be depended on in considering whether a fact is material." Hutchinson, 647 F.3d at 490 (quoting SAB 99, 64 Fed. Reg. at 45,152) (alteration in original).  In particular, where a disclosure contains many revelations, there is insufficient cause and effect to establish that any one revelation is material.  Id. at 489-90.  The Muddy Waters Report contained many allegations, each of which could have caused some market reaction.  As a result, the market reaction to the Muddy Waters Report is insufficient to support qualitative materiality with respect to the brand cooperation program.

The Consolidated Amended Class Action Complaint does not contain facts sufficient to support a plausible inference that the brand cooperation program was a significant aspect of New Oriental's operations or elicited a significant market reaction. SAB 99, 64 Fed. Reg. at 45,142.  The plaintiffs have thus failed to allege qualitative materiality.  Because the misstatements were also quantitatively immaterial, the plaintiffs have failed

38

to state a claim that the defendants made material misstatements
or omissions by failing to disclose the brand cooperation
program.

## IV.

The defendants argue that this action should be dismissed
because the plaintiffs have not alleged facts sufficient to
support a strong inference of scienter.  The scienter required
to support a securities fraud claim can be "intent to deceive,
manipulate, or defraud, or at least knowing misconduct." SEC v.
First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)
(internal citations omitted).  The PSLRA requires that a
complaint alleging securities fraud "state with particularity
facts giving rise to a strong inference that the defendant[s]
acted with the required state of mind."  15 U.S.C. § 78u-
4(b)(2).  Scienter may be inferred from (i) facts showing that a
defendant had "both motive and opportunity to commit the fraud,"
or (ii) facts that constitute "strong circumstantial evidence of
conscious misbehavior or recklessness." ATSI, 493 F.3d at 99.

The facts must give rise to a strong inference of scienter
with regard to each defendant.  See Plumbers and Pipefitters
Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.,
741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010).  Further, "in

determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 323 (2007).  A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u> at 324; <u>ATSI</u>, 493 F.3d at 99; see also <u>City of Roseville</u>, 814 F. Supp. 2d at 418-19.  In this case, the plaintiffs have plausibly alleged scienter based on the defendants' conscious misbehavior or recklessness with respect to the alleged misstatements and omissions concerning the underlying contractual arrangements with NOC and consolidation.

To allege scienter based on the defendants' conscious misbehavior or recklessness, the plaintiffs must allege facts constituting strong circumstantial evidence of such behavior. Plaintiffs may make this showing by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." <u>Novak</u>, 216 F.3d at 308. The Second Circuit Court of Appeals has explained that "reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either

40

known to the defendant or so obvious that the defendant must
have been aware of it." <u>Chill</u>, 101 F.3d at 269  (internal
quotation marks omitted); <u>Kalnit v. Eichler</u>, 264 F.3d 131, 142
(2d Cir. 2001).  In some cases, recklessness can be inferred
from "[a]n egregious refusal to see the obvious, or to
investigate the doubtful." <u>Chill</u>, 101 F.3d at 269 (internal
quotation marks omitted); <u>see also</u> <u>Arbitron Inc.</u>, 741 F. Supp.
2d at 489-90.[7]

---

[7] Where motive is not apparent, "the strength of the
circumstantial allegations must be correspondingly greater."
<u>Kalnit</u>, 264 F.3d at 142 (internal quotation marks omitted).  In
this case, the plaintiffs have alleged that Yu possessed a
unique financial incentive to consolidate NOC fraudulently.  The
Consolidated Amended Class Action Complaint states that Yu's
company, Century Friendship, possessed at all times during the
Class Period either a controlling or absolute interest in NOC.
(CAC ¶¶ 36, 39.)  Yu thus stood to benefit twice from
consolidation: first through sales of his New Oriental ADS and
second through the benefits that accrued to NOC once New
Oriental obtained access to U.S. capital markets.  The
plaintiffs also pleaded that Yu, through his mother, sold $113.9
million in New Oriental ADS during the class period.  (CAC
¶ 130.)  These allegations suggest that consolidation allowed Yu
to obtain an uncommonly massive benefit distinct from those
typically held by other executives.  <u>Cf.</u> <u>Elliot Associates, L.P.</u>
<u>v. Hayes</u>, 141 F. Supp. 2d 344, 359 (S.D.N.Y. 2000) ("[C]ourts
within this Circuit have long held that allegations of generic
motivations typically held by similarly-positioned executives
are insufficient to establish motive.")  However, it is
unnecessary to decide whether the plaintiffs have alleged
scienter against Yu and New Oriental on the basis of motive
because the plaintiffs have alleged strong circumstantial
evidence of recklessness with respect to each defendant.

In this case, the plaintiffs pleaded that NOC contributed
during the Class Period between 62% and 67% of New Oriental's
assets and between 97% and 98.9% of New Oriental's revenues.
The plaintiffs also pleaded that New Oriental's continued
viability on United States capital markets was contingent upon
the continued right to consolidate NOC.  Consolidation thus
supplied New Oriental with an overwhelming amount of its value.

The defendants represented that New Oriental's service
agreements, exclusive option agreement, and equity pledge with
NOC or NOC's shareholders were sufficient to support
consolidation.  However, the plaintiffs plausibly allege that
each of these agreements was so critically and obviously
deficient that the defendants must have been aware of the
alleged fact that the agreements did not support New Oriental's
consolidation of NOC.  According to the Consolidated Amended
Class Action Complaint, New Oriental's service agreements lacked
any provision providing New Oriental with the right to demand
from NOC anything but a small portion of NOC's residual returns,
even though New Oriental represented that it had such rights and
that consequently it was able to consolidate NOC's financials
with its own.  (CAC ¶ 96.)  The plaintiffs allege similarly
obvious defects with respect to the effectiveness of New

Oriental's equity pledge agreement and exclusive option agreement.

Because the deficiencies in New Oriental's contractual arrangements with NOC were obvious, the plaintiffs have sufficiently alleged that the defendants' representations with respect to the contractual agreements themselves and the resulting consolidation were highly unreasonable and support a strong inference that the defendants acted at the very least recklessly.  Indeed, New Oriental derived nearly all of its value from consolidation and Yu and Hsieh were, respectively, New Oriental's CEO and CFO.  Accordingly, if Yu and Hsieh were not fully aware of the conspicuous deficiencies in New Oriental's contractual arrangements, their lack of knowledge could only have arisen from an egregious refusal to see the obvious, which further supports a strong inference of recklessness.  Chill, 101, F.3d at 269; see also SEC v. Dunn, 587 F. Supp. 2d 486, 504 (S.D.N.Y. 2008).  The notion that Yu could have been unaware of deficiencies in the contracts supporting consolidation is particularly implausible, given that Yu was at all times during the Class Period the controlling shareholder of NOC and thus party to or directly affected by the service agreements, equity pledge, and exclusive option agreement.

43

The plaintiffs have offered in support of scienter an inference at least as strong as that offered by the defendants. While the defendants assert that no inference of scienter is warranted because their independent auditors continued to certify New Oriental's financials, reliance on an independent accountant cannot completely absolve the defendants of their obligation to ensure the sufficiency of contracts upon which New Oriental's financial viability is contingent.  See In re Reserve Fund Sec. & Derivative Litig., No. 09 Civ. 4346, 2012 WL 4774834, *2 (S.D.N.Y. Sept. 12, 2012) (stating that good faith reliance on accountant is not a complete defense to scienter in securities fraud case); see also In re Winstar Commc'ns., No. 01 Civ. 3014, 2006 WL 473885, *8 (S.D.N.Y. Feb. 27, 2006) (recognizing that corporate officials have a "well defined obligation to ensure the accuracy of the information filed with the SEC" even where they have in good faith relied on independent accountants (internal quotation marks omitted)).  At this stage in the litigation, there is no way to determine what disclosures were made to the auditors and what considerations led the auditors to certify the financial statements.  See In re Reserve Fund Sec., 2012 WL 4774834, at *2 (recognizing that showing of full disclosure to independent auditors is required

44

to sustain defense that party in good faith relies on those auditors).

The defendants also argue that no strong inference of scienter is warranted because New Oriental appointed an independent committee to investigate consolidation after the Muddy Waters Report was published.  Ordinarily, New Oriental's formation of an independent committee to investigate potential defects in the company's VIE structure would provide some evidence of non-fraudulent intent.  See e.g., Slayton v. Am. Express Co., 604 F.3d 758, 776-77 (2d Cir. 2010).  However, the defendants' decision to commence an investigation does not rebut the allegation of scienter in this case because, as the defendants acknowledge, New Oriental's independent committee terminated their investigation without reaching any conclusions about whether consolidation was appropriate.  The decision to commence an investigation demonstrates non-fraudulent intent only to the extent that it demonstrates a commitment to addressing fraudulent activity; such a commitment is ambiguous when an investigation is terminated before supplying shareholders with any information about the alleged fraud.

New Oriental's risk disclosures also cannot support an inference of non-fraudulent intent.  In its annual reports, New Oriental explained only that its service agreements might prove

45

unenforceable under PRC law and that NOC might breach pertinent agreements.  New Oriental never explained that the contracts were insufficient to support consolidation.  Indeed, New Oriental's public disclosures represented just the opposite. Accordingly, this is not a case where New Oriental made a disclosure broad enough to cover the relevant risk.  Hunt v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 730-31 (2d Cir. 1998).

New Oriental's decision not to restate its financials after the SEC's Division of Corporate Finance raised no objection, does provide some evidence of non-fraudulent intent.  However, the defendants acknowledge that the SEC's Enforcement Division continues to investigate whether New Oriental's consolidation of NOC was appropriate.  Accordingly, New Oriental may yet be required to revise past financial statements.  Under these circumstances, New Oriental's decision not to restate financials does not rebut the plaintiff's allegation of scienter.  See In re Ambac Fin. Grp. Inc. Sec. Litig., 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010) (holding alleged GAAP violations actionable where company had not restated financials but plaintiffs had pleaded facts giving rise to strong inference of scienter).

Taking into account plausible opposing inferences, the plaintiffs allege a sufficiently strong inference of scienter.

Tellabs, Inc., 551 U.S. at 323.  Although New Oriental's
reliance on third party auditors and its decision not to restate
its financials provide some evidence of non-fraudulent intent,
the plaintiffs have pleaded specific facts supporting an equally
strong inference of scienter based on the magnitude of the
alleged fraud, Katz v. Image Innovations Holdings, Inc., 542 F.
Supp. 2d 269, 273-74 (S.D.N.Y. 2008), and obviousness of the
asserted misbehavior, each of which suggest that the defendants'
alleged misrepresentations were an extreme departure from
ordinary standards of care.   Chill, 101 F.3d at 269.  Because
the plaintiffs have adequately alleged scienter with respect to
the individual defendants, they have also alleged scienter as to
New Oriental.  See Teamsters Local 445 Freight Div. Pension Fund
v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008).[8]


                                v.

     The defendants finally argue that this action should be
dismissed because the plaintiffs have not alleged facts
sufficient to support loss causation.  This argument is without

_____

[8] Because the plaintiffs have not alleged material misstatements
or omissions relating to the brand cooperation program, the
plaintiffs cannot allege a strong inference that the failure to
disclose the brand cooperation program was reckless or
intentional.  See Plumbers Union Local No. 12 Pension Fund v.
Swiss Reinsurance Co., 753 F. Supp. 2d 166, 185 (S.D.N.Y. 2010).

merit.  To allege loss causation under Section 10(b) and Rule 10b-5, the plaintiff must provide in their Consolidated Amended Class Action Complaint "notice of what the relevant economic loss might be and what the causal connection might be between that loss and the [alleged] misrepresentation." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005).  To provide the requisite notice, the plaintiffs must plead economic loss and either "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement," ATSI, 493 F.3d at 107, or "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell v. Merrill Lynch & Co., 396 F.3d 171, 173 (2d Cir. 2005); see also City of Roseville, 814 F. Supp. 2d at 422-23. "[P]artial disclosures can satisfy the loss causation requirement." Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

New Oriental announced on July 17, 2012 that the SEC was conducting an investigation into its financials.  New Oriental also disclosed that it believed the investigation concerned its consolidation of NOC.  The defendants argue that the July 17, 2012 announcement was not a corrective disclosure because it did not reveal any misconduct.  However, disclosure of an SEC

48

investigation into a particular business practice can be
sufficient to allege loss causation with respect to alleged
misstatements regarding that practice.  See, e.g., In re IMAX
Sec. Litig., 587 F. Supp. 2d 471, 485-86 (S.D.N.Y. 2008)
(finding public disclosure of SEC investigation into company's
"multiple element accounting" sufficiently specific to
constitute corrective disclosure with respect to misstatements
about application of that accounting procedure); In re Take-Two
Interactive Sec. Litig., 551 F. Supp. 2d 247, 286-90 (S.D.N.Y.
2008) (finding public disclosure of SEC investigation "into
certain stock option grants" sufficiently specific to constitute
corrective disclosure with respect to alleged misstatements
about process for granting stock options).  On July 17, 2012,
New Oriental announced that it was being investigated by the SEC
and that the company believed that the investigation pertained
to consolidation.  This disclosure revealed to the market a
potential problem with consolidation that had previously been
concealed by the defendants' alleged misstatements.  The
disclosure also negatively affected the value of New Oriental
shares, which declined by $12.76 over the following two days of
trading.  Accordingly, the July 17 announcement is sufficient to
allege loss causation.[9]

---

[9] The parties dispute whether the Muddy Waters report, released

## VI.

The plaintiffs also allege that the individual defendants and New Oriental are liable under Section 20(a) of the Exchange Act, which provides:

> Every person who, directly, or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI, 493 F.3d at 108.  The defendants' only argument for dismissal of the Section 20(a) claim is that the plaintiffs have not adequately alleged a primary violation. Accordingly, the motion to dismiss the Section 20(a) claim is

---

the day after New Oriental announced the SEC investigation, constitutes a corrective disclosure.  It is unnecessary to decide whether the report constitutes a corrective disclosure because the drop in the ADS price following announcement of the SEC investigation is sufficient.

**denied with respect to the plaintiffs' consolidation claim and granted with respect to the plaintiffs' brand cooperation claim.**

### CONCLUSION

The Court has considered all of the remaining arguments of the parties.  To the extent not specifically addressed above, they are either moot or without merit.  For the foregoing reasons, the defendants' motion to dismiss is **granted in part and denied in part.  The Clerk is directed to close docket No. 26.**

SO ORDERED.


Dated:    New York, New York
          December 23, 2013          _____/s/_____
                                           John G. Koeltl
                                     United States District Judge

51